# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### September 21, 2005 Session

## STATE OF TENNESSEE v. RONNIE D. SIMS

**Appeal from the Criminal Court for Davidson County**
**No. 2002-C-1454     Steve Dozier, Judge**

————————

**No. M2004-02491-CCA-R3-CD - Filed November 22, 2005**

————————

The Defendant, Ronnie D. Sims, was convicted by a jury of one count of aggravated robbery, one count of vandalism,[1] and one count of possession of burglary tools. After a hearing, the trial court sentenced the Defendant as a Range II, multiple offender, to seventeen years in the Department of Correction for the aggravated robbery conviction. The trial court sentenced the Defendant to concurrent sentences of six years for the vandalism conviction and eleven months, twenty-nine days for the burglary tools offense. In this direct appeal, the Defendant contests the sufficiency of the evidence; claims that his right to a fair trial was compromised by the State's loss of evidence; and complains that his seventeen year sentence for the aggravated robbery is excessive. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J.C. MCLIN, JJ., joined.

James Martin, Nashville, Tennessee, for the appellant, Ronnie D. Sims.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Dumaka Shabazz, Assistant District Attorney General, for the appellee, State of Tennessee.

————————

[1]The Defendant was convicted of vandalism of $1,000 or more but less than $10,000.

# OPINION

## FACTS

Joseph Leach testified that, on the morning of June 5, 2002, he and the Defendant were walking down the street in the Vanderbilt University area. The goal of their walk was "to occupy a vehicle," that is, "[t]o obtain one." When they saw a woman in a minivan in a parking lot, they "approached her -- and asked her for the keys to the van." Mr. Leach stated that, at the time, he "had something in [his] hand" and the woman "obliged" his request and handed over her keys. According to Mr. Leach, the woman "looked somewhat scared." He and the Defendant then got in the van and drove away, with the Defendant driving. At this point in time, Mr. Leach had known the Defendant about a year.

Mr. Leach stated that, after they left the scene, law enforcement officers followed them "in hot pursuit," but they did not pull over. Rather, they tried to "get away" and "evade him." During the chase, the van swerved in order to miss hitting someone and "[d]uring that time the vehicle came to a stop." The Defendant and Mr. Leach both got out of the van. Because the airbag had deployed on the passenger side, Mr. Leach was delayed in extricating himself from the van. By the time he was actually out of it, the police officer was "close on the scene." As Mr. Leach took a "few steps" away from the van, the officer told him to stop and took him into custody. The Defendant, however, got away.

Mr. Leach testified that the next time he saw the Defendant was about thirty to forty minutes later; at that time, the Defendant was in police custody.

Mr. Leach stated that, when he accosted the victim, he had a screwdriver. He pointed it at her during their encounter. He did not recall if he touched her with it, but he brandished it in the manner of a deadly weapon.

On cross-examination, Mr. Leach admitted that he was testifying pursuant to a plea bargain offer. He also admitted that, after he was apprehended, he did not tell the police his accomplice's name. He admitted that, if he went to trial, he was facing the possibility of a forty-plus year sentence. With the plea bargain, he would be receiving a sentence of about half of that. Mr. Leach also admitted to past convictions of armed robbery and burglaries.

Bridgette Willette testified that she is employed by Vanderbilt University. She was reporting to work early on the morning of the robbery because she had a presentation to make. She pulled into a parking lot, parked, and began to rehearse her presentation while she sat in the driver's seat. When she was ready, she got out of the minivan and opened the sliding door on the driver's side to remove her presentation materials. As she was doing so, she noticed two men walking across the campus, headed in her direction. She did not pay them any attention, however, thinking that they were part of a shift change. As she was in the process of gathering her materials, she saw the two men coming toward her. One of the men was a few steps ahead of the other one, and when he got to the van, he immediately demanded her keys. This man had a screwdriver and grabbed her left arm. The

screwdriver was pointed at her chest. He kept saying, "Give me your keys." She was convinced that the man was going to stab her with the screwdriver. She testified, "I was frightened, I was in shock."

Ms. Willette had left the driver's door of the van open and the second man got into the driver's seat. When he discovered that the keys were not in the ignition, he began screaming, "Give me your keys." At this point, both men were screaming at her. She did not have the keys on her person. The second man got her purse from the front seat and was going through it. Unable to find the keys, he told Ms. Willette, "You got one minute to give me your keys or I'm getting my gun." She told him, "Then you need to help me find them, 'cause I don't have them. Check the ignition. Check in my purse. Check the front seat, in the console, look around. I don't have the keys." She was face to face with the second man during this encounter, about an arm's length away. She identified this man as the Defendant.

When he could not find the victim's keys, the Defendant handed Ms. Willette her purse. She found her keys, at which point the Defendant grabbed them and the purse and jumped back in the driver's seat of the van. The man with the screwdriver got into the van through the sliding door. Ms. Willette protested that she needed her presentation materials, but the Defendant yelled, "Hell, no. Shut the damn door." At that, the man with the screwdriver closed the door and the Defendant drove off. In addition to stealing her van, the two men stole the victim's purse, cell phone, some money, and credit cards.

Ms. Willette ran to a "Blue Phone" in the parking lot, which connected her automatically to the Vanderbilt Police Department. She reported that her van had been stolen by two men. She described them to the police as two black men, one wearing "blue plaid or some kinda plaid [shirt], and the other one had on [a] blue [shirt]." She recalled the Defendant as wearing a plain blue tee shirt.

Ms. Willette testified that the police arrived very quickly, within three to five minutes. Vanderbilt Police Officer Dennis was the first to arrive. She repeated her report to him, telling him that her assailants were two black men, and telling him what she could remember about what they were wearing. She remembered that the man with the screwdriver had facial hair. After a few minutes, Ms. Willette's boss arrived, and she recounted the events to her. Officer Dennis then informed the victim that her van had been located, wrecked, and the police had taken one person into custody, whom they wanted her to view.

Officer Dennis drove to the site, where Ms. Willette viewed her van, "wrecked." Both airbags had deployed and the windshield was cracked. The van had also suffered other damages. Total repairs approximated $11,000.

At the site, Ms. Willette viewed the suspect and determined that he was the man who had accosted her with the screwdriver. This man was wearing a plaid shirt. Ms. Willette immediately identified him to the police.

Five or ten minutes later, the police told her that they had someone else they wanted her to view. They drove to the location and she saw a man on the sidewalk with some police officers. When she looked at the man, she told the police, "That's the driver." At that time, the man was wearing a blue tee shirt and some blue shorts. Ms. Willette testified, "I knew absolutely who it was." Ms. Willette reiterated at trial that the Defendant was one of her assailants and the man who had driven away in her van.

On cross-examination, Ms. Willette acknowledged that she did not include a physical description of the Defendant or of the Defendant's clothing in the written statement she gave to the police. During her initial phone call to the police and in response to their questions about what her assailants were wearing, she recalled saying, "The main thing I can remember is blue." She further recalled saying that one of the men was wearing plaid, and the other one "blue."

Ms. Willette stated that she remained in the police car at the time she viewed the Defendant. The Defendant was on the sidewalk across the street with at least two officers. The Defendant was the only black man in the area not wearing a uniform. Ms. Willette did not subsequently view a photographic line-up because she was sure that the man was her assailant. Ms. Willette acknowledged that the police did not require the Defendant to say anything in her presence. She further admitted that, at the time she viewed the Defendant, she was still upset from the incident.

Donald D. Dennis testified that he is employed by the Vanderbilt University Police Department and works in the patrol division. He responded to Ms. Willette's call by driving to her location and making sure she was okay. Officer Dennis described the victim's condition at that time as "very, very upset, almost to the point of being hysterical." He spoke with her in an effort to calm her and to determine whether she needed medical attention. After the van was wrecked and the first suspect was apprehended, he took her to that scene. She made a positive identification of the suspect without hesitation and with certainty.

Officer Dennis was also present when Ms. Willette initially identified the Defendant. He stated that there was no hesitation on her part in making the identification and that she "was very sure that was the second individual." Upon seeing him, she "started to get upset again."

Officer Dennis testified that Ms. Willette had given a physical description of the Defendant when she "called it in" and that she repeated that description to him when he arrived. On cross-examination, he recalled the initial call as describing the assailants as "two black men." He stated that the call contained a "more detailed description," but he could not recall "the specifics of it."

Defense counsel asked Officer Dennis if he knew the location of the audio recording of Ms. Willette's initial phone call. Officer Dennis explained that the tape had been destroyed after being kept for ninety days. When prompted by defense counsel that, since the tape had been destroyed, "we'll never know what that description was," Officer Dennis responded, "Unless it's on CAD, the-- the typed entry."

-4-

William L. Hood testified that, on the morning in question, he was a sergeant with Vanderbilt University Police Department. He responded to a dispatcher's call regarding the van robbery. Within two minutes, he saw a van matching the description of the stolen one. He tracked it and saw the van stopped about halfway down a street, where some individuals had walked up to it. Sgt. Hood called for more officers through the Metro dispatcher. As Sgt. Hood continued to observe the van, one of the individuals who had approached it looked up and stepped away from the van. At that point, the van "just took off." Sgt. Hood began pursuing the van but did not activate his "equipment." He continued to seek reinforcements.

Eventually, as he kept following the van, Sgt. Hood came upon it "crashed." Sgt. Hood saw two individuals get out of the van through the driver's side. Sgt. Hood, being alone, decided not to pursue the suspects on foot. He watched them progress in a "slow-trot run" up the street. After they ran about fifty or sixty yards, one suspect ran across the street. The other suspect turned around and began coming toward Sgt. Hood. At that point, Sgt. Hood got out of his car and ordered the approaching suspect to stop. As Sgt. Hood took this suspect into custody he saw the other suspect run through a grassy area. Sgt. Hood noticed the fleeing suspect's size and height and that he had a "slight balding - kinda thinning of the hair." He testified that he had earlier seen the suspects' faces when they got out of the van and crossed in front of his car, looking back at him as they did so. However, Sgt. Hood stated that he did not get a "good look" into the face of the suspect who got away.

After Sgt. Hood took the one suspect into custody, a Metro officer arrived and Sgt. Hood advised him about the other suspect's flight. Sgt. Hood testified that the fleeing suspect had been wearing jeans and a paisley shirt. After the suspect in custody was secure, Sgt. Hood began walking the area in an attempt to find the suspect who had fled. Within ten minutes, he saw a man who looked like the suspect because his "features just stood out." Sgt. Hood had encountered other black men during his search but they did not appear to him to be the suspect. With the assistance of another officer, Sgt. Hood stopped this man and spoke with him. Sgt. Hood testified that the man he stopped was "the same height, build" as the man he had seen get out of the van. Sgt. Hood also testified that the man "seemed very nervous, panting."

Sgt. Hood testified that the man he stopped was wearing jogging shorts and a blue tee shirt. The man also had on running shoes, which were wet and bore grass seeds. The appearance of the man's shoes was consistent with his having run through a field. Sgt. Hood had not yet taken the man into custody when the victim was brought over to view the man's appearance. Sgt. Hood was present during her observation and described her identification of the man as "adamant."

On cross-examination, Sgt. Hood acknowledged that, at the time he stopped the second suspect, he was not one hundred percent sure that the suspect was indeed the other man who had gotten out of the van. He further acknowledged that, at the time he came upon the wrecked van, the only description he had of the suspects was two black men, one wearing a plaid shirt. The man reported wearing the plaid shirt eventually turned out to be Mr. Leach. When Sgt. Hood saw the other suspect, he was wearing a paisley design shirt that buttoned. Sgt. Hood acknowledged that,

at the time he stopped the second suspect, he was not wearing the same clothes that he had seen on the man who ran across the field. Sgt. Hood also acknowledged that, although the van had suffered serious damage, the second suspect did not appear injured.

Sgt. Hood testified that, at the time Ms. Willette arrived for her viewing of the second suspect, the man was surrounded by three officers in uniform, including Sgt. Hood. After her identification, officers began searching the area for the clothing that Sgt. Hood had initially observed on the second suspect. They did not find the clothing. They did not attempt to collect fingerprints from the van.

During redirect examination, Sgt. Hood identified a pair of vice grip pliers that he had recovered from the area where he initially saw the two suspects running from the van. Sgt. Hood heard the tool hit the ground as the men were running.

On the basis of this proof, the jury convicted the Defendant of aggravated robbery, vandalism, and possession of burglary tools. The Defendant now contends that the evidence is not sufficient to support his convictions, and that his trial was fundamentally unfair because the audio tape of the victim's 911 call was destroyed. We will address these contentions in turn.

**ANALYSIS**

**I. Sufficiency of the Evidence**

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from

circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

### A. Aggravated Robbery

Our criminal code defines aggravated robbery as the intentional or knowing theft of property from the person of another by violence or putting the person in fear, accomplished with a deadly weapon or by display of any article used to lead the victim to reasonably believe it to be a deadly weapon. See Tenn. Code Ann. § 39-13-402(a)(1). In this case, two men accosted the victim and demanded she give them the keys to her car. One of these men brandished a screwdriver, pointing it at the victim while he held her by the arm. The victim testified that the encounter caused her to be fearful and that she thought she was going to be stabbed. After gaining possession of the victim's keys, the two men absconded with the victim's vehicle. This evidence is sufficient to establish all of the elements of the crime of aggravated robbery.[2]

### B. Vandalism

A person commits vandalism when he or she "knowingly causes damage to or the destruction of any real or personal property of another . . . knowing that the person does not have the owner's effective consent[.]" Tenn. Code Ann. § 39-14-408(a). Here, the proof established that the two perpetrators deliberately took the victim's van and drove away in it. The two men did not have the victim's effective consent to take the van. While driving it with a law enforcement officer in pursuit, the perpetrators wrecked the van, causing significant damage to it. Thus, the State established all of the elements of the crime of vandalism.

### C. Possession of Burglary Tools

Our criminal code provides that "[a] person who possesses any tool, machine or implement with intent to use the same, or allow the same to be used, to commit any burglary, commits a Class A misdemeanor." Id. § 39-14-701. A person commits a burglary when he or she, "without the effective consent of the property owner . . . [e]nters any freight or passenger car, automobile, truck, trailer, boat, airplane or other motor vehicle with intent to commit a felony, theft or assault or commits or attempts to commit a felony, theft or assault." Id. § 39-14-402(a)(4). In this case, the proof at trial established that the perpetrators used a screwdriver with which to accost the victim, thereby accomplishing the entry and theft of her minivan. Thus, the State established all of the elements of the crime of possession of burglary tools.

The Defendant does not contest the State's proof that Ms. Willette was the victim of an aggravated robbery and vandalism. Nor does he argue that the State failed to prove that the perpetrators were in possession of a burglary tool. Rather, he argues that the proof of his identity as one of the perpetrators is not sufficient. The Defendant contends that Mr. Leach's testimony was motivated by his self-interest in obtaining a favorable plea bargain and is therefore not trustworthy.

---

[2]Although the Defendant did not himself brandish the screwdriver, his participation in the aggravated robbery rendered him subject to conviction of the offense under the theory of criminal responsibility for the conduct of another. See Tenn. Code Ann. § 39-11-402.

The Defendant also contends that the victim's testimony is not sufficiently reliable to support his convictions. The Defendant points to the brief period of time in which the Defendant was face to face with Ms. Willette; her fear during the encounter and focus on the weapon being pointed at her chest; her vague description of her assailants during her initial call to the police; and the suggestive circumstances of her subsequent observation of the Defendant after his apprehension by the police. Finally, the Defendant argues that Sgt. Hood's apprehension of the Defendant was tinged with doubt about the Defendant being the "right" man until the victim's (suspect) identification of him. Accordingly, the Defendant suggests that Sgt. Hood's testimony in support of the Defendant's identification as the second perpetrator should be viewed with a skeptical eye.

While we agree with the Defendant that these three witnesses' testimony is subject to the questions he raises, we are constrained to point out that all of these objections go to the weight and credibility of the proof elicited through these persons. Moreover, all of these concerns were raised through cross-examination at trial and were therefore presented to the jury. It is the jury's function to analyze testimony and determine the facts therefrom. This Court will not second-guess a jury's determinations about the weight and credibility of evidence. Moreover, "[t]his Court has repeatedly held that the question of identification of the defendant as the person who committed the crime for which he is on trial is a question of fact for the determination of the jury, upon consideration of all the competent proof." State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981).

Viewing the evidence in the light most favorable to the State, this case includes the testimony of two eyewitnesses identifying the Defendant as one of the two perpetrators. A conviction may be based solely on the testimony of a single eyewitness. See State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (holding that the testimony of a victim may, by itself, be sufficient to support a conviction). The proof in this case of the Defendant's identity is more than sufficient to support his convictions. Accordingly, this issue is without merit.

## II. Loss of 911 Tape

The proof at trial established that the recording of the victim's initial call to the Vanderbilt police was destroyed pursuant to that organization's policy. Relying on our supreme court's opinion in State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), the Defendant argues that the loss of this recording deprived him of a fair trial. The State disagrees.

In Ferguson, our supreme court held that, "[g]enerally speaking, the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. at 917 (footnote omitted). However, due to the difficulty of defining the boundaries of this duty, our supreme court appeared to adopt in Ferguson the boundaries determined in a decision of the United States Supreme Court:

> Whatever duty the [federal] Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was

destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Ferguson, 2 S.W.3d at 917 (quoting California v. Trombetta, 467 U.S. 479, 488-89, 104 S.Ct. 2528, 2533-34, 81 L.Ed.2d 413 (1984)).

Thus, before reaching the issue of whether the State failed in its duty to preserve evidence,[3] we must first make a threshold determination about the exculpatory value of the missing proof. The Defendant argues that the exculpatory value of the missing audio recording of the victim's 911 call is in her initial description of the man who drove her van away. Based on the testimony elicited at trial, the Defendant contends that that initial description was either so vague as to make clear the victim's inability to accurately identify the man; or that it differed in some critical manner from the Defendant's appearance so as to make it clear that he was not the man who attacked her. However, defense counsel was able to establish at trial through his cross-examination of the State's witnesses that, indeed, Ms. Willette's initial description of the two men who robbed her was vague, consisting basically of nothing more than a report of their skin color and, possibly, a nebulous description of what they were wearing. Defense counsel was also able to establish that, when he was apprehended, the Defendant was not wearing the same clothing that the driver was observed to have been wearing at the time Officer Hood saw him get out of the van. That is, defense counsel thoroughly established at trial that there were conflicts in the reports of the driver's appearance as of the time the Defendant was apprehended and identified as the driver.

We fail to see how an audio recording of the 911 call would have been of material assistance to the Defendant unless the victim had described her assailants as being of some complexion other than black. However, there is no suggestion that the initial report contained any information that was contrary to the Defendant's appearance other than, possibly, the clothes he was wearing at the time he was apprehended. Indeed, even the Defendant is forced to wonder how the recording might have been helpful to his cause, asking rhetorically in his brief, "if there was a more specific description as alluded to by officer Dennis, was there anything exculpatory to the defendant?" The mere possibility of exculpatory content does not trigger a finding that the State failed in its general duty to preserve evidence under Ferguson. See State v. Coulter, 67 S.W.3d 3, 54-5 (Tenn. Crim. App. 2001).

Furthermore, we are constrained to point out that, during his testimony, Officer Dennis suggested that there may be a typed entry "on CAD" reciting the content of the 911 call. There is no indication in the record that this potential proof is missing or has been destroyed. Accordingly, the record indicates the possibility that the Defendant could have obtained comparable evidence by reasonably available means.

---

[3]In its appellate brief, the State argues that "the Vanderbilt University Police Department is not an arm of the State for purposes of the analysis in State v. Ferguson." The State refers to no authority for this proposition. We are not persuaded that the State's argument has merit.

We conclude that the Defendant has failed to satisfy Ferguson's threshold requirement that the lost audio tape possessed constitutional materiality. Accordingly, the Defendant's argument that the State failed in its duty to preserve the evidence is without merit, as is his claim that the loss of the 911 tape rendered his trial fundamentally unfair.

Because we find that the 911 tape does not meet the standard of constitutional materiality, we also reject the Defendant's argument that his lawyer was not able to effectively cross-examine the State's witnesses without the tape.

### III. Sentencing

In addition to challenging his convictions, the Defendant contends that his seventeen year sentence for his aggravated robbery conviction is excessive. The only additional proof adduced at the Defendant's sentencing hearing was his presentence report, which sets forth the Defendant's criminal history. The Defendant does not contest his classification as a Range II, multiple offender. As such, he was subject to a sentencing range of twelve to twenty years for the aggravated robbery conviction, a Class B felony, and a range of four to eight years for the vandalism conviction, a Class D felony. See Tenn. Code Ann. § 40-35-112(b)(2), (b)(4) (Repl. 2003). The presumptive sentences for these felonies is the minimum in the range. See id. § 40-35-210(c) (Repl. 2003).[4]

The trial court increased the Defendant's sentence for the aggravated robbery conviction to seventeen years based on three enhancement factors: the Defendant's criminal history; his previous history of unwillingness to comply with the conditions of a sentence involving release in the community; and his commission of the instant offenses while on parole from a prior felony conviction. See id. § 40-35-114(2), (9), (14)(B) (Repl. 2003). The trial court increased the Defendant's sentence for the vandalism conviction to six years based on the same factors. The trial court found no mitigating factors.

The Defendant now complains that the trial court improperly enhanced his aggravated robbery sentence in light of the United States Supreme Court decision, Blakely v. Washington, 124 S.Ct. 2531 (2004). The Blakely decision holds that the Sixth Amendment to the federal Constitution permits a defendant's sentence to be increased only if the enhancement factors relied upon by the judge are based on facts reflected in the jury verdict or admitted by the defendant. See id. at 2537. The only basis upon which enhancement is otherwise permitted is the defendant's previous criminal history: where the defendant has prior convictions, the trial court may enhance the defendant's sentence without an admission or jury finding. See Apprendi v. New Jersey, 530 U.S. 466, 490 (2000); Blakely at 2536. However, the Tennessee Supreme Court has considered the impact of Blakely on Tennessee's sentencing scheme and concluded that the Criminal Sentencing Reform Act of 1989, pursuant to which the Defendant was sentenced, does not violate a defendant's Sixth

---

[4]We note that our legislature has recently amended several provisions of the Criminal Sentencing Reform Act of 1989, said charges becoming effective June 7, 2005. However, the Defendant's crimes in this case, as well as his sentencing, predate the effective date of these amendments. Therefore, this case is not affected by the 2005 amendment, and the statutes cited in this opinion are those that were in effect at the time the instant crimes were committed.

Amendment rights.  <u>See</u> <u>State v. Gomez</u>, 163 S.W.3d 632, 661 (Tenn. 2005).  Accordingly, the Defendant's argument on this basis has no merit.

## **CONCLUSION**

We affirm the judgments of the trial court.

_____
DAVID H. WELLES, JUDGE